IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER CYRUS, | ) | CASE NO. 5:15CV896 |
| | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

## I.    Introduction

Plaintiff, Jennifer Cyrus ("Cyrus"), seeks judicial review of the final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.    Procedural History

Plaintiff applied for supplemental security income in January, 2011.  (Tr. 306.)  Ms. Cyrus alleged her disability began on January 1, 2003. (Tr. 306.)  Ms. Cyrus's application was denied initially (Tr.229-235) and after reconsideration (Tr. 239-245).  On January 6, 2012, Ms. Cyrus requested an administrative hearing (Tr.246-248).

A hearing was held before the Administrative Law Judge ("ALJ"), Michael S. Kaczmarek, on May 22, 2013.  (Tr. 148.)  The ALJ issued a decision on June 14, 2013, finding that Cyrus was not disabled.  (Tr. 72.)  On July 22, 2013, Cyrus requested a review of the ALJ's

decision by the Appeals Council (Tr. 147). The Appeals Council denied review, rendering the ALJ's October 23, 2013 decision final (Tr. 1).

## III. Evidence

### A. Personal, Educational and Vocational Evidence

Cyrus was born on January 28, 1978 and was 33 years old on the date her application was filed. (Tr. 151.) She graduated from high school and obtained an Associate's Degree in Psychology. (Tr. 156.) Cyrus does not have any past relevant work. (Tr. 86.)

### B. Medical Evidence

Cyrus alleges that her disability began on January 1, 2003. (Tr. 306)

On September 2, 2009, Cyrus reported to the Wooster Community Hospital emergency department that she had been "blacking out" during her menstrual cycle, but that all tests she had undergone had been normal. (Tr. 620)

On August 18, 2010, plaintiff was admitted to Mercy Medical Center from Dunlap Memorial Hospital for a possible seizure. (Tr. 411-419) An EEG recording was normal, as was a brain MRI. (Tr. 411, 418) Cyrus was discharged to home on August 20, 2010. (Tr. 412) Her final diagnosis included "conversion reaction consisting of altered level of consciousness as well as seizure-like activity." (Tr. 412) Cyrus was instructed to follow up with her primary care physician in one to two weeks and to follow up with a mental health care facility. (Tr. 412)

Plaintiff presented to the Counseling Center of Wayne & Holmes County on August 26, 2010. (Tr. 565) Ms. Cyrus reported that she was unable to work but was hopeful of returning to her job. (Tr. 566) She was diagnosed with major depressive disorder and assigned a Global Assessment of Functioning (GAF) score of 55. (Tr. 572)

2

A cervical MRI on September 23, 2010 found no significant central canal or neural foraminal stenosis.  (Tr. 458)

On September 26, 2010, plaintiff visited the emergency department at Dunlap Memorial Hospital after a motor vehicle accident.  (Tr. 434)  She reported that she had "a spell" and did not really remember it.  (Tr. 434)  Ms. Cyrus was diagnosed with cervical strain and seizure disorder. (Tr. 434)  Mark Hatcher, M.D. instructed plaintiff that she should not be driving.  (Tr. 434)

On October 5, 2010, plaintiff followed up with Dale Angerman, M.D. (Tr. 482)  Dr. Angerman's notes indicate that plaintiff had developed left-sided weakness earlier in the summer and injured her neck in the car accident. (Tr. 482)  The notes also indicate that she was having problems with depression and anxiety and had been under a lot of stress.  (Tr. 482)  Plaintiff reported that she was going to physical therapy for her left sided weakness and neck pain. (Tr. 482)  Dr. Angerman diagnosed neck pain, post trauma; possible syncope; and depression.  (Tr. 482)  A cervical X-ray showed a bony fragment at C2, possibly related to previous trauma.  (Tr. 485)  A cervical CT scan on October 14, 2010 was unremarkable.  (Tr. 486-487)  An EEG on October 18, 2010 was normal.  (Tr. 646)

On December 23, 2010, plaintiff saw Mark Weaver, M.A., P.C.C.S., at the Counseling Center.  (Tr. 576)  He diagnosed major depressive disorder, recurrent, moderate, rule out post-traumatic stress disorder ("PTSD".)  (Tr. 576)

On January 6, 2011, plaintiff was treated for pseudo-seizure at the emergency department of Wooster Community Hospital following a seizure. (Tr. 708)  Attending physician, Ugo Gallo, M.D., noted the following:

> Reviewing her records, she apparently is not on any anticonvulsants.  She has significant psychological issues.  She has unusual rhythmic motion of her right hand and head.  She did receive Valium prior to arrival.  There was no

> incontinence of urine or stool.  There was no biting of her tongue or lip.  First test
> I performed, since she was not verbal, was the arm avoidance test which she held
> her arm up transiently and fell to her side.  Once I told her she was not seizing and
> this is a false seizure, she stopped abruptly and looked at Maureen, the charge
> nurse.  She then was able to speak with the nurse and give her information with
> regards to past medical history, etc.

(Tr. 708)  Dr. Gallo also reported that her exam was normal and that she appeared depressed.

(Tr. 708)  Plaintiff was instructed to follow up with Dr. Angerman and her counselor at the Crisis

Center.  (Tr. 708)

On January 20, 2011, plaintiff followed up with Dr. Angerman.  (Tr. 791)  Plaintiff

reported that she had been more anxious and was having trouble sleeping.  (Tr. 792)  She told

Dr. Angerman that she had been awakened by the emergency room doctor, who felt she was

probably having a pseudo-seizure.  (Tr. 791)  Dr. Angerman's notes also state that plaintiff had

what was initially thought to be a stroke last summer, but the hospital had then felt that it was a

conversion reaction.  (Tr. 791)  Plaintiff reported being under a lot of stress because her ex-

husband was in prison for abusing one of her children.  (Tr. 791)

Also on January 20, 2011, plaintiff saw neurologist, William Novak, M.D. and he

recommended evaluation by a physician at the main campus of the Cleveland Clinic.  (Tr. 934-

936)  He also instructed her to stop taking anti-epileptic medication, advised her not to drive and

gave her other seizure precautions.  (Tr. 936)

Plaintiff continued to treat with Mr. Weaver at the Counseling Center of Wayne and

Holmes Counties.  (Tr. 577-579)  On February 7 and 16, Mr. Weaver observed moderate

depression and moderate anxiety.  (Tr. 578, 579)  On February 25, 2011, Mr. Weaver noted

normal mental status evaluation but for mild depression.  (Tr. 577)

On March 16, 2011, plaintiff's neurologist, Dr. Novak, noted that plaintiff's seizures

were non-epileptic and instructed her to follow up with psychiatry for PTSD.  (Tr. 932)

On March 23, 2011, plaintiff reported to Mr. Weaver that, during a recent hospitalization, the Cleveland Clinic had referred her to psychiatry, had told her that she was having stress-induced seizures, and had diagnosed her with depression, anxiety and PTSD.  (Tr. 863)

On March 29, 2011, plaintiff followed up with Dr. Angerman for seizures and depressive disorder.  (Tr. 779)  Plaintiff reported still having seizure like activity at least once a day, sometimes in her sleep.  (Tr. 779)  Dr. Angerman's notes state that he wrote her a letter stating that she would be unable to work for least six months and also requesting a home health aide twice a week for bathing.  (Tr. 780)

On April 27, 2011, plaintiff saw Dr. Novak's nurse practitioner for a recent seizure episode.  (Tr. 931)  Plaintiff was instructed to see a psychiatrist "STAT."  (Tr. 931)

On April 28, 2011, plaintiff had a pseudo-seizure during counseling at the Counseling Center of Wayne and Holmes County. (Tr. 855)  Plaintiff's fiancé reported that, during such episodes, when recalling her history of childhood sexual abuse, she would hit herself or pull her hair or lash out verbally as though in a flashback to the abuse. (Tr. 855)  Mr. Weaver called an ambulance and plaintiff was transported to the emergency department at Wooster Community Hospital.  (Tr. 855-857)  Plaintiff was noted to have a longstanding history of depression, anxiety, PTSD and pseudo-seizures.  (Tr. 650)  She was diagnosed with pseudo-seizures, depression and anxiety, and mental health decompensation.  (Tr. 650)  Attending physician, Stacy Shundry, M.D., contacted Mr. Weaver who felt that plaintiff was decompensating and required psychiatric admission.  (Tr. 650)  Dr. Shundry "pink-slipped" plaintiff for psychiatric admission to Barberton Summa Hospital, where plaintiff stayed until May 2, 2011.  (Tr. 650, 843, 856, 857)

5

Plaintiff did not show up for her next appointment with Dr. Weaver on May 6, 2011.  (Tr. 849)  Mr. Weaver called her and plaintiff stated that she did not want to continue counseling with Mr. Weaver.  (Tr. 849)  She was angry that he had sent her to the hospital and she had been pink-slipped to Barberton Summa Hospital.  (Tr. 849)  She told Mr. Weaver that she was scheduled to see another counselor at a different agency on May 9th.  (Tr. 849)

On May 9, 2011, plaintiff met with a different counselor at Your Human Resource Center and reported she did not want to return to Mr. Weaver again because he had involuntarily admitted her to Barberton Summa Hospital.  (Tr. 804)  Plaintiff was diagnosed with "post-traumatic stress disorder and depressed mood; rule out bipolar disorder mixed with psychotic features; avoidant and depressive personality disorder with passive aggressive traits and paranoid features."  (Tr. 810)

On May 12, 2011, plaintiff met with Vera Astreika, M.D., for a follow up appointment after being discharged from Barberton Summa Hospital.  (Tr. 843-845)  Plaintiff reported a lower level of anxiety with medication compliance but complained of falling asleep during the day.  (Tr. 843)  Ms. Cyrus also reported that she was continuing to have panic attacks triggered by stress as well as having flashbacks and nightmares.  (Tr. 843)  Plaintiff avoided public places and felt on guard when in public.  (Tr. 843)  Plaintiff described to Dr. Astreika that she had been gang-raped three times and molested by her biological father when she was three years old, and that her husband was in prison for having molested her older son.  (Tr. 844)  Dr. Astreika noted that plaintiff fell asleep during the interview, had an anxious mood, had possible borderline intelligence, had fair insight and judgment and presented with PTSD symptoms.  (Tr. 844-845)  Dr. Astreika diagnosed PTSD, depressive disorder, cluster B personality disorder traits, possible borderline intellectual functioning, and she assigned a GAF scale score of 50.  (Tr. 845)

6

On May 20, 2011, plaintiff saw Dr. Novak's nurse practitioner.  (Tr. 930)  Plaintiff reported that she had seen a psychiatrist and that she had had fewer non-epileptic seizures since starting Abilify.  (Tr. 930)

Plaintiff saw Dr. Astreika on June 10, 2011.  (Tr. 836)  Dr. Astreika noted that plaintiff had stopped taking Abilify because of nausea and vomiting and returned to Risperdal.  (Tr. 836) Plaintiff also reported that she was having daytime sleepiness and was not able to work.  (Tr. 836)  Plaintiff requested a work excuse for the Department of Job & Family Services.  (Tr. 836) Plaintiff complained of having episodes of rage when thinking about her past abuse.  (Tr. 836) Dr. Astreika noted normal mental status but for fair insight and judgment, "angry" mood, and symptoms of PTSD. (Tr. 836)  Dr. Astreika assigned a GAF scale score of 50.  (Tr. 836)

Plaintiff met with Dr. Astreika again on June 24, 2011.  (Tr. 833)  Plaintiff reported feeling better but that she was still angry.  (Tr. 833)  Plaintiff was not sure that counseling would help.  (Tr. 833)  Dr. Astreika completed a mental capacity assessment for the Department of Job & Family Services.  (Tr. 833)  Plaintiff presented with normal mental status but for fair insight and judgment and symptoms of PTSD and anger.  She was assigned a GAF scale score of 50. (Tr. 833)

Plaintiff saw Dr. Astreika again on July 8, 2011 and reported feeling less angry than when last seen.  (Tr. 830)  Dr. Astreika noted normal mental status, with fair insight and judgment, and symptoms of PTSD and anger, "somewhat improved," with a GAF scale score of 30.  (Tr. 830)

On July 12, 2011, plaintiff returned to the Wooster Community Hospital emergency department with her husband, who reported that she had four seizures lasting approximately ten minutes that day.  (Tr. 657)  Her husband also reported that plaintiff had up to 10 seizures per

7

day depending on her "stress and anxiety" level.  (Tr. 657)  Plaintiff did not have any seizure activity while at the emergency department and was discharged with a diagnosis of recurrent pseudo-seizures.  (Tr. 657-58)

Plaintiff followed-up with Dr. Angerman on July 13, 2011.  (Tr. 750-752)  Plaintiff requested a letter stating that she could not attend the work hardening program for Medicaid. (Tr. 751)  She complained that her medications made her lethargic and that she was sleeping all day long.  (Tr. 750-751)  Dr. Angerman diagnosed seizure disorder, lethargy, dehydration and anxiety.  (Tr. 752)  He gave her a letter stating that plaintiff could probably not work for the next three months.  (Tr. 752)

On July 14, 2011, plaintiff went to the emergency department again following another seizure.  (Tr. 697)  Plaintiff reported that she had a typical seizure and would not have sought medical treatment but a bystander had called 911.  (Tr. 697)  She reported having up to ten seizures per day, typically occurring with stress.  (Tr. 697)  Attending physician, Christopher Dussell, M.D., diagnosed chronic seizure disorder and discharged plaintiff.  (Tr. 697)

On July 15, 2011, plaintiff saw Dr. Astreika and reported increased confusion and increased frequency of pseudo-seizures.  (Tr. 827)  Dr. Astreika noted that plaintiff appeared sedated, with her eyes closed, had a "stressed" mood and fair insight and judgment.  (Tr. 827) Dr. Astreika diagnosed PTSD, depressive disorder, cluster B personality traits, possible borderline intellectual functioning and assigned a GAF scale score of 40. (Tr. 827)

On August 7, 2011, Mr. Weaver noted that plaintiff was not seeing anyone for counseling, although she was supposed to have been assigned to a counselor at Your Human Resource Center.  (Tr. 823)  Mr. Weaver questioned whether plaintiff should be seeing him again or be reassigned to another counselor at his facility.  (Tr. 823-4)

Plaintiff saw Dr. Astreika on August 10, 2011 and reported feeling somewhat better though still presented as being confused/sedated.  (Tr. 822)  She told Dr. Astreika that she liked Risperdal because it helped her "not to have crazy thoughts."  (Tr. 822)  Dr. Astreika noted plaintiff's GAF scale score as 50.  (Tr. 822)

On August 26, 2011, plaintiff saw Dr. Astreika again and noted that she had improved since taking Risperdal, but had been having increased anxiety and nightmares since the death of a friend.  (Tr. 818)  Dr. Astreika noted that plaintiff's mood was stressed and her insight and judgment was fair.  (Tr. 818)  Dr. Astreika diagnosed PTSD, depressive disorder, cluster B personality disorder traits, possible borderline intellectual functioning, and a GAF scale score range of 50-60.  (Tr. 818)

On October 14, 2011, plaintiff saw Dr. Angerman for follow-up complaining of several migraines per week and what were "probably pseudoseizures."  (Tr. 735)  Dr. Angerman's diagnosis was migraines, hypokalemia, sciatica, back pain and epilepsy.  (Tr. 737)

On October 24, 2011, Dr. Astreika's notes indicate that plaintiff had been feeling better since she was last seen. (Tr. 817)  She was complying with her medications.  (Tr. 817)  Her mental status was normal and her diagnosis was unchanged, as was her GAF scale score.  (Tr. 817)

Plaintiff saw Dr. Novak on November 2, 2011.  Dr. Novak noted that plaintiff's pseudo-seizures/non-epileptic seizures persisted and that "surprisingly" her only psychiatric medication was Celexa.  (Tr. 928)

On December 13, 2011, plaintiff saw Dr. Astreika who noted that plaintiff had been feeling good and was compliant with her medication regimen. (Tr. 816)  She observed normal mental status and diagnosed PTSD, depressive disorder, cluster B personality disorder traits,

9

possible borderline intellectual functioning and assigned a GAF scale score range of 50-60.  (Tr. 816)

Plaintiff visited Dr. Astreika on April 4, 2012 and reported that she had been in and out of the hospital since February 2012. (Tr. 1016)  She reported that she had been complaint with her medication and denied having any side effects. (Tr. 1016)  Plaintiff also reported being very stressed.  (Tr. 1016)  Dr. Astreika noted that plaintiff's insight and judgment were fair and that she had a normal mental status.  (Tr. 1016)  Dr. Astreika did not modify her previous diagnosis or GAF scale score range of 50-60.  (Tr. 1016)

Plaintiff visited the emergency department at Wooster Community Hospital on May 1, 2012. (Tr. 967)  The emergency department history notes state that "a 34 year-old woman who presents from work because of pseudoseizure and head contusion."  (Tr. 967)  Plaintiff had a contusion over her left brow, had pain out of proportion to tactile stimuli.  (Tr. 967)  She was discharged with a diagnosis of contusion of head status post fall secondary pseudoseizure with a history of pseudotumor cerebri.  (Tr. 967)

On May 7, 2012, Sarel Vorester, M.D. sent a letter informing Dr. Novak that Dr. Vorster had evaluated plaintiff for headaches and recent visual disturbances but that all studies had been negative. (Tr. 939)  Dr. Vorster was unable to confirm a diagnosis of pseudotumor cerebri and was unable to identify any other intracranial pathology that would explain her symptoms.  (Tr. 939)

Plaintiff returned to Dr. Astreika on May 24, 2012 and reported increased anxiety and depression because her fiancé has some suspicious findings on lung X-rays.  (Tr. 1015)  Plaintiff was having crying spells and insomnia due to anxiety and was in therapy at human resources.  (Tr. 1015)  Dr. Astreika observed normal mental status but for anxious mood, fair insight and

judgment and worsening anxiety symptoms due to stress.  (Tr. 1015)  Plaintiff's diagnosis remained the same and her GAF scale score was stated as 50.  (Tr. 1015)

Plaintiff had another seizure on May 29, 2012 and was taken by ambulance to Wooster Community Hospital.  (Tr. 965)  The EMS notes stated that her entire body had been shaking, and according to a bystander, had been shaking for eight minutes prior to EMS arrival.  (Tr. 965) Plaintiff had fallen and hit her head.  (Tr. 965)  A CT scan of plaintiff's brain showed air fluid in her sinus but was otherwise unremarkable.  (Tr. 965)  Plaintiff and her family informed the emergency department staff that she was going to start seeing Dr. Bavis instead of Dr. Novak. (Tr. 966)  Plaintiff was discharged with a diagnosis of head injury status post pseudo-seizure. (Tr. 966)

Plaintiff saw Dr. James Bavis, Jr., M.D., on May 30, 2012 and reported her history of pseudo-seizures.  (Tr. 1118-1119)  Dr. Bavis observed an odd gait and movements which he felt were psychogenic and pain related.  (Tr. 1119)  After reviewing plaintiff's medical history, Dr. Bavis assessed that she had non-epileptic pseudoseizures and told her that this condition needed to be treated by a psychiatrist.  (Tr. 1119)

Plaintiff returned to the Wooster community Hospital emergency department on May 32, 2012 and reported having a seizure.  (Tr. 962)  The reason she went to the emergency department was for pain in her neck.  (Tr. 962)  She returned there again on June 6, 2012 following a seizure. (Tr. 960)  She was discharged with a diagnosis of migraine headache and pseudoseizure.  (Tr. 960)

Plaintiff saw Dr. Bavis on June 8, 2012 and complained of severe headache, neck pain and frequent seizures.  (Tr. 1113-1116)  Dr. Bavis increased plaintiff's Topamax and Neurontin but would not prescribe narcotics for headache control.  (Tr. 1115)

11

Plaintiff saw Dr. Astreika on June 21, 2012 and complained of feeling depressed, tired, having leg pain, insomnia, poor concentration, daily anxiety attacks, and nightmares. (Tr. 1014) Plaintiff had restarted Topamax and was compliant with her Risperidone and Celexa but was not taking her Lorazepam or Vistaril because they were not helping her anxiety and they were making her tired and sleepy. (Tr. 1014) Plaintiff reported that she had lost sensation in both legs and had fallen several times. (Tr. 1014) Dr. Astreika's notes indicate that plaintiff had a crippled appearance and was walking with a cane. (Tr. 1014) Dr. Astreika noted normal mental status but for depressed mood, constricted affect, fair insight and judgment, and worsened symptoms. (Tr. 1014) She diagnosed PTSD, major depressive disorder, recurrent and moderate, cluster B personality disorder traits, and possible borderline intellectual functioning, and she assigned a GAF scale score range of 40 to 50. (Tr. 1014) She discontinued plaintiff's Celexa, Lorazepam and Vistaril, continued Risperidone and added Cymbalta. (Tr. 1014)

A lower extremity electromyography nerve conduction velocity study on July 2, 2012 was normal. (Tr. 1112)

On August 2, 2012, plaintiff saw Dr. Bavis and reported migraine headaches and occipital neuralgia. (Tr. 1093) Dr. Bavis noted Plaintiff's odd gait disorder had resolved, "which again furthers the feeling that I had that she was having a psychogenic gait disorder issue." (Tr. 1093)

On August 13, 2012, plaintiff told Dr. Astreika she had been very anxious and had more seizures since having a miscarriage one month prior. (Tr. 1013) Plaintiff stated that she was also stressed because her irresponsible brother and his fiancé were living with her. (Tr. 1013) Plaintiff had not tolerated Cymbalta due to chest pain but was taking Celexa and Risperidone. (Tr. 1013) Plaintiff also requested Ativan. (Tr. 1013) Dr. Astreika observed anxious mood and

12

congruent affect, with fair insight and judgment and she assigned a GAF scale score of 50-60. (Tr. 1013)

On September 3, 2012, plaintiff was taken by ambulance to the Wooster Community Hospital emergency department after her fiancé believed she had stopped breathing while having one of her pseudoseizures.  (Tr. 1085)  He reported that he had given her mouth to mouth resuscitation.  (Tr. 1085)  However, when the EMS arrived, plaintiff's oxygen saturation level was 100. (Tr. 1085)  She was awakened by EMS. (Tr. 1085)  A chest X-ray was normal.  (Tr. 1085)  Plaintiff recovered and was discharged with the diagnosis of pseudoseizure.  (Tr. 1085)

On September 13, 2012, plaintiff met with Dr. Astreika who noted that plaintiff had been medication compliant and was feeling good.  (Tr. 1066)  She had an allergic reaction to Oxbutynin that caused apnea and was scheduled for a hysterectomy in October.  (Tr. 1066)  Dr. Astreika noted that plaintiff had a normal mental status, with a mood close to euthymic and fair insight and judgment.  (Tr. 1066)  Dr. Astreika's diagnoses remained the same.  (Tr. 1066)  She assigned a GAF scale score of 60.

Plaintiff returned to the emergency department on March 4, 2013.  (Tr. 1156-57)  Plaintiff complained of bilateral leg edema and shortness of breath.  (Tr. 1156)  Tests returned normal results.  (Tr. 1157)  She was discharged with the diagnoses of bilateral leg edema, dyspnea, chest pain, atypical and paresthesias of uncertain cause.  (Tr. 1157)

### C.  Opinion Evidence

#### 1.    Treating Physician

On May 10, 2011, neurologist, Selwyn-Lloyd McPherson, M.D. responded to the Commissioner's requests for records.  Dr. McPherson indicated that he had treated plaintiff from July 17, 2008 to August 30, 2010.  (Tr. 611)  He indicated that plaintiff had been diagnosed with

migraine headaches, chronic insomnia, caffeine dependence, leg cramps, and a history of conversion disorder.  (Tr. 611)  He noted that plaintiff's headaches seemed worse with stress and that he had treated her for possible stroke and seizures but that all tests had been normal.  (Tr. 611)  Dr. McPherson opined that plaintiff had no physical, emotional or mental impairments. (Tr. 612)

### 2. Consulting Examining Psychologist

On May 10, 2011, plaintiff was evaluated by consultative psychologist, Curt Ickes, Ph.D. (Tr. 625-630)  Plaintiff reported being unable to work due to seizures and panic attacks.  (Tr. 626)  Dr. Ickes noted a normal mental status evaluation but for mild depression and borderline intellectual functioning.  (Tr. 626-627)  Plaintiff reported sadness, crying spells, loss of interest, social withdrawal, occasional helplessness and hopelessness, low frustration tolerance, disturbed sleep, panic attacks three to four times per month, and nightmares and flashbacks from her childhood molestation.  (Tr. 626-627)  Dr. Ickes diagnosed plaintiff with major depressive disorder, recurrent – moderate; panic disorder without agoraphobia; PTSD and borderline intellectual functioning.  (Tr. 628)  He assessed a GAF scale score of 45.  (Tr. 628)  He opined that plaintiff would be markedly limited in her ability to relate well with others; mildly impaired in her ability to understand, remember and follow instructions; markedly impaired in her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks; and extremely impaired in her ability to withstand the stress and pressure associated with day-to-day work activities.  (Tr. 629)  Dr. Ickes opined that plaintiff would be able to manage her own funds if she were awarded benefits.  (Tr. 629)

14

### 3.    Reviewing Psychologists

On July 27, 2011, Leslie Rudy, Ph.D. completed two forms: 1) the Psychiatric Review Technique ("PRT") form; and 2) the Mental Residual Functional Capacity Assessment ("MRFCA") form in relation to Ms. Cyrus.  The PRT form completed by Dr. Rudy indicated that plaintiff's mental impairments did not meet or medically equal Listings 12.04, 12.05, or 12.06. In rating the "paragraph B criteria" used to assess the severity of mental impairments, Dr. Rudy assigned ratings of moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (Tr. 202)

The MCRFA form completed by Dr. Rudy states that plaintiff "had two episodes apparently believed to be conversion reactions in August and September 2010," which coincided with "legal proceedings against [her] former spouse for child abuse."  (Tr. 206)  There was "[n]o evidence in file indicating ongoing episodes." (Tr. 206)  Dr. Rudy also indicated that Dr. Ickes' opinion "is an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning."  (Tr. 207)  Dr. Rudy's assessment was later affirmed by state agency psychological consultant, Karla Voyten, Ph.D. (Tr. 218-219, 221-223) Dr. Voyten, like Dr. Rudy, afforded limited weight to Dr. Ickes' opinion because it relied heavily on plaintiff's self-report rather than objection psychological evidence.  (Tr. 220)

### D.    Testimonial Evidence

### 1.    Cyrus's Testimony

Plaintiff testified at a hearing before Administrative Law Judge Michael S. Kaczmarek on May 22, 2013. (Tr. 150)  Plaintiff was 35 years old on the date of the hearing.  (Tr. 156)  She testified that she graduated from high school and had a two-year associates' degree in

psychology from the University of Phoenix.  (Tr. 156)

Plaintiff worked as a cook at a restaurant between 1997 and 2000.  (Tr. 158)  She also worked as a packer at IPS Marketing for a couple of years.    (Tr. 158)  Plaintiff tried to go back to work in 2010 for about two weeks, but testified that she had a "grand mal seizure and a mini stroke."  (Tr. 160)  She has not worked since that time.  (Tr. 161)

Plaintiff testified that she cannot work because she has panic attacks, anxiety attacks, certain smells or things she sees cause her to have seizures.  (Tr. 161)  She also has anger issues and doesn't do well with people looking over her shoulder.  (Tr. 161)

Plaintiff described her seizures as convulsions.  (Tr. 161)  She stated that she typically loses consciousness and does not remember having a seizure when they are done.  (Tr. 161-162)  Plaintiff testified that she has lost control of her bladder before during a seizure, although that is very rare.  (Tr. 161)  She does not bite her tongue during seizures.  (Tr. 162)   She testified that she has one to six seizures a day.  (Tr. 162)

Plaintiff testified that she was living with her fiancé, David, her sister-in-law and her three children.  (Tr. 162)   She testified that her fiancé, sister-in-law, and oldest son assist her when she has a seizure.  (Tr. 163)  They tap her on the cheeks, talk to her and rub her arms.  (Tr. 163)  Sometimes they get a cold rag and put it on her face.  (Tr. 163)  Plaintiff also testified that being around too many people caused her to have panic attacks.  (Tr. 164)

During the day, plaintiff spends much of her time watching T.V. and sleeping.  (Tr. 164, 165, 176)  She sleeps after having seizures.  (Tr. 164)  She tries to play on the computer or read books but gets bored and goes to sleep.  (Tr. 165)

Plaintiff testified that her physicians have told her that she has pseudoseizures.  (Tr. 165)  She understands that her seizures are treated by counseling and psychiatry and that they do not

have a physical basis.  (Tr. 165)

Plaintiff also stated that she suffers chronic headaches.  (Tr. 166)  She has these headaches daily and they last two to three hours.  (Tr. 166)  Plaintiff receives IV injections that are helping with her headaches.  (Tr. 167)  Plaintiff also testified to having neck pain that may be related to her headaches.  (Tr. 171)

Plaintiff also testified that she had carpal tunnel syndrome.  (Tr. 167-168)  Her fingertips go numb and her wrists hurt.  (Tr. 168)  She testified that this sometimes affects her ability to bathe and dress herself.   (Tr. 168)  She testified that she has to have someone in the bathroom with her at all times.  (Tr. 168)  She has fallen in the bathtub before because of her seizures.  (Tr. 168)

Plaintiff testified that the only thing she is able to do around the house is to fold laundry.  (Tr. 169)  She said that standing too long hurts her back.  (Tr. 169)  Plaintiff was using a walker when she attended the hearing.  (Tr. 169)  She testified that she had been using it for the past month or two because of pain in her lower back.  (Tr. 169)  Plaintiff testified that, as recent as 2011 and 2012, she could do the dishes. (Tr. 170)  However, in 2013, she fell down the stairs, hurt herself, and has been in pain management since then.  (Tr. 170)

Plaintiff testified that she no longer goes grocery shopping.  (Tr. 171)  She does not leave her house, even to visit family and friends.  (Tr. 172-3)  Plaintiff testified that she does not leave her house to attend any of her children's activities.  (Tr. 173)  She attends parent-teacher conferences by phone.  (Tr. 173)  Plaintiff drove until 2010 but has not driven since then due to her seizures.  (Tr. 174)

Plaintiff testified that she doesn't sleep well.  (Tr. 176)  She typically goes to bed around 11:00 p.m. and gets back up at 3:00 a.m.  She then lies back down at 6:00 a.m. and gets up at

8:00 a.m.  (Tr. 176)  Plaintiff has stairs in her home but doesn't use them anymore.  (Tr. 177)
She fears falling after she fell and hurt her tailbone.  (Tr. 177)

Plaintiff testified that she is in counseling and that it was going well.  (Tr. 178)  Plaintiff
testified that she smokes a half a pack of cigarettes a day, but she does not use alcohol or illegal
drugs.  (Tr. 180)

Plaintiff testified that the last time she was around a lot of family was at a birthday party
on May 15, 2013.  (Tr. 182)  Several family members came to her house to celebrate her son's
birthday.  (Tr. 182)  Plaintiff stated that she had to leave the room several times and take an
Ativan due to the amount of people gathering around her.  (Tr. 183)  She feels trapped when she
is around groups of people.  (Tr. 184)  Plaintiff has not gone on any vacations or weekend trips.
(Tr. 184)

### 4.    Vocational Expert's Testimony

Vocational Expert ("VE"), Brian Wilmer, testified by phone during the hearing.  (Tr.
184-191)    For the first hypothetical question, Mr. Wilmer was asked to consider an individual
of claimant's age, education and work history, who had the same residual functional capacity
with no exertional limitations, but the individual could never climb ladders, ropes, and scaffolds,
must avoid all exposure to hazards such as inherently dangerous moving machinery and
unprotected heights.  (Tr. 185-186) The individual could also not perform any commercial
driving as part of her duties and must be limited to simple, routine, repetitive tasks. (Tr. 185-186)

The VE testified that such an individual could perform some unskilled jobs at the
medium, light, and sedentary exertional levels.  (Tr. 186)  The VE believed this hypothetical
individual could work as a hand packager with approximately 7,200 positions available in the
State of Ohio and 860,000 in the national economy.  (Tr. 186)  The individual could also work as

a kitchen helper with approximately 30,400 jobs in Ohio and 3.2 million in the national economy, and a laundry worker with approximately 14,000 positions available in Ohio and 1.2 million nationally. (Tr. 186)

For hypothetical number two, the VE was told to assume the same facts as hypothetical one, except this individual must work in a static environment with infrequent change and those changes that did occur would be explained and demonstrated and could be learned in 30 days or less. (Tr. 187) There would be no fast pace or strict production time quotas and this individual would not be responsible for the health or safety of others. (Tr. 187) This person would only have occasional interaction with the general public. (Tr. 187) The VE opined that, with these additional limitations, the hypothetical individual could still perform the three jobs stated in response to the first hypothetical question. (Tr. 187)

For hypothetical number three, the ALJ further limited the individual to having no contact with the general public and frequent interaction with coworkers and supervisors. (Tr. 187) With this limitation, the VE testified that the previously stated jobs would still be available. (Tr. 188)

For hypothetical number four, the VE was instructed that the individual was limited to light work. (Tr. 188) The VE testified that there would be light jobs that such an individual could perform including: laundry worker, with approximately 3,200 jobs available in Ohio and 82,000 in the national economy; mail clerk, with 950 positions available in Ohio and 42,000 in the national economy; and office cleaner, with 1,400 in the State of Ohio and 19,500 in the national economy. (Tr. 188-189)

However, when questioned by plaintiff' attorney, the VE testified that if the individual was off task 15% of the time there would not be any jobs available for that person. (Tr. 189)

19

## IV.     Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV.  The ALJ's Decision

The ALJ issued a decision on June 14, 2013.  A summary of his findings is as follows:

1.  Cyrus had not engaged in substantial gainful activity since January 27, 2011, the alleged onset date.  (Tr. 77)

2.  Cyrus has the following severe impairments: obesity, bilateral pitting edema, umbilical hernia, status-post surgery, migraine headaches, pseudo-seizures, an affective disorder, anxiety disorder, panic disorder and post-traumatic stress disorder.  (Tr. 77)

3.  Cyrus does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 79)

4.  Cyrus has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  She could not climb ladders, ropes, or scaffolds and must avoid all exposure to workplace hazards, including commercial driving, dangerous moving machinery and unprotected heights.  She is limited to the performance of simple, routine, repetitive tasks. Work should not involve frequent verbal communications, and should be limited to simple, routine, and repetitive tasks, in a work environment free of fast-paced production requirements, involving only work-related decisions, with few, if any, workplace changes.   She can engage in occasional interactions with the general public, coworkers, and supervisors.  (Tr. 80-81)

5.  Cyrus has no past relevant work.  (Tr. 86)

6.  Cyrus was born on January 28, 1978 and was 32 years old, which is defined as a younger individual age 18-49 on the date the application was filed. (Tr. 86)

7. Cyrus has at least a high school education and is able to communicate in English. (Tr. 86)

8. Transferability of job skills is not material to the determination of disability because Ms. Cyrus does not have any past relevant work. (Tr. 86)

9. Considering Ms. Cyrus's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. 87)

Based on the foregoing, the ALJ determined that Cyrus had not been under a disability from January 27, 2011 through the date of the decision.[2] (Tr. 88)

## V.    Parties' Arguments

Plaintiff filed her brief on the merits on August 7, 2015. (Doc. 10) Plaintiff argues that the ALJ's finding that plaintiff is capable of light work was not supported by substantial evidence. (Doc. 10, p. 15-20) Plaintiff argues that her impairments meet or medically equal in severity to the criteria for the somatoform disorders of listing 12.07. 20 CFR Part 404, Subpart P, Appendix 1.    With respect to Listings 12.04, 12.06, and 12.07, the ALJ made the following findings:

> In activities of daily living, the claimant has moderate restriction. In session with the consultative psychological examiner, the claimant reported engaging child rearing and raising activity, some household chores, conceded the ability to manage her own finances to access public transportation and to live independently.

> In social functioning, the claimant has moderate difficulties.  The claimant endorsed difficulty being around others, yet in session with the consultative psychological examiner, the claimant reported no problems relating to the general public, admitted of no forensic history, and was quite pleasant and polite.

---

[2] Plaintiff has no past relevant work and is considered ineligible for Disability Insurance Benefits. (Tr. 86) Because SSI Benefits are authorized by Title XVI of the Act, which does not provide for retroactive payment of benefits, the adjudicator typically determines whether the claimant was disabled on or after the application date. (Tr. 77) In this matter, the ALJ considered whether Cyrus was disabled as of January 27, 2011, the application date. (Tr. 75)

> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  In session with the consultative psychological examiner, the claimant was alert and oriented in all spheres, displayed below average fund of knowledge, vocabulary, and computational skills, performing, overall, in the borderline range of intellectual function.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

(Tr. 80)  Plaintiff argues that these findings, as articulated above, lack the support of substantial evidence.

Plaintiff argues that the ALJ relied on interview observations from a single psychological examination to find that plaintiff was only moderately limited in activities of daily living.  (Doc. 10, p. 17-18)  Plaintiff points out that the examiner, from whose report the ALJ drew supporting facts for his findings, found that plaintiff would have a "markedly impaired" ability to relate to others, to maintain attention, concentration, persistence and pace and an "extremely impaired" ability to withstand the stress and pressure associated with day-to-day work activities.   This examiner also opined that plaintiff's overall global assessment functioning score was 45, indicating serious impairment in functioning.

Plaintiff also contends that the ALJ failed to provide any specific analysis for plaintiff's pseudo-seizure disorder. (Doc. 10, p. 18)   Plaintiff points out that the plaintiff's treating physicians and examining doctors (for the most part) attributed plaintiff's seizures to psychiatric etiology, diagnosed them as pseudo-seizures, and urged plaintiff to seek psychiatric treatment instead of neurological treatment.  Despite this, plaintiff believes that the ALJ evaluated her pseudo-seizures as a physical impairment, finding plaintiff's allegations of severity as not fully credible.  Plaintiff points out that the ALJ compared her seizure symptoms against medical evidence.  Plaintiff argues that the ALJ erred by not evaluating plaintiff's pseudo-seizures under

Listings 12.06 and 12.07. (Doc. 10, p. 18-19) Plaintiff argues that the ALJ's failure to adequately analyze plaintiff's mental impairments and his finding that she did not have an impairment that met or medically equaled the severity of one of the listed impairments was clearly erroneous. Plaintiff moves the court to reverse the ALJ's decision without remand. (Doc. 10, p. 20)

Defendant filed a brief on November 3, 2015. (Doc. 13) Defendant argues that, in arguing that her impairments meet or medically equal the requirements of Listings 12.04, 12.06, or 12.07, plaintiff relies on the opinion of examining sources, Curtis Ickes, Ph.D. Defendant contends that the ALJ explained why he did not credit Dr. Ickes' opinion and why he credited the contrary opinions of the state agency psychological consultants. (Doc. 13, p. 6) Defendant argues that the ALJ's decision falls within the "zone of choice" within which the Commissioner is permitted to act, without fear of interference from the court. *See, Buxton v. Halter,* 246 F3d 762, 773 (6th Cir. 2001)

Defendant argues that substantial evidence supports the ALJ's findings at Step Three of the sequential evaluation process. (Doc. 13, p. 7) As stated above, the ALJ found that plaintiff's mental impairments did not meet a listing because she had only moderate restrictions in activities of daily living, social functioning, and concentration, persistence, or pace, and no extended episodes of decompensation. Defendant, recognizing that the ALJ relied upon the opinions of two non-examining psychologists when making this finding, argues that the ALJ provided good reasons for affording great weight to the opinions of these psychologists and for affording little weight to the opinion of a one-time examining source. (Doc. 13, p. 7) Defendant contends that the ALJ properly determined that plaintiff's mental impairments created moderate limitations in the paragraph B criteria and properly evaluated plaintiff's impairments in relation to Listing

24

12.07.

Defendant also argues that there is substantial evidence supporting the ALJ's assessment of plaintiff's credibility.  (Doc. 13, p. 11-12)  Contrary to plaintiff's argument, defendant states that the ALJ evaluated plaintiff's pseudo-seizures as mental impairments.  The ALJ did not give full credit to plaintiff's subjective complaints because the record didn't support the frequency alleged by plaintiff.  Defendant argues that the ALJ fully explained his findings related to defendant's credibility and that defendant failed to address these findings in her brief.  (Doc. 13, p. 12-13)

## VI.    Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Whether Plaintiff's Mental Impairments Meet or Medically Equal in Severity the Criteria of Listings 12.04, 12.06 and 12.07

Plaintiff argues that the ALJ erred in finding that her mental impairments did not meet or medically equal the criteria for Listings 12.04, 12.06 or 12.07. (Doc. 10, p. 16-20) In order to qualify as "disabled" under a Listing in the Secretary's regulations, a claimant must demonstrate that he or she meets all of the criteria contained in the Listing. *See Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986) Alternatively, "[a] claimant can demonstrate that she is disabled because her impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to all the criteria for the one most similar listed impairment." *Foster v. Halter,* 179 F.3d 348, 355 (6th Cir. 2001). "This decision must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques." *Land v. Secretary of Health and Human Services,* 814 F.2d 241, 245 (6th Cir. 1986)

Ms. Cyrus contends that her mental impairments meet or medically equal in severity the criteria of the Listings of Impairments 12.04, 12.06, or 12.07. Listing 12.04 includes affective disorders, 12.06 are anxiety related disorders, and Listing 12.07 covers somatoform disorders. In her brief, plaintiff specifically directs the court's attention to Listing 12.07 which provides:

**12.07 Somatoform disorders**: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented by evidence of one of the following:

27

1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

2. Persistent nonorganic disturbance of one of the following:
   a. Vision; or
   b. Speech; or
   c. Hearing; or
   d. Use of a limb; or
   e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
   f. Sensation (e.g., diminished or heightened).

3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND

B. Resulting in at least two of the following:
   1. Marked restriction of activities of daily living; or
   2. Marked difficulties in maintaining social functioning; or
   3. Marked difficulties in maintaining concentration, persistence, or pace; or
   4. Repeated episodes of decompensation, each of extended duration.

In determining that plaintiff's mental impairment did not meet or medically equal the Listings in 12.04, 12.06, and 12.07, the ALJ stated that he had considered whether the "paragraph B" criteria were satisfied.  He found that the claimant had moderate restriction, rather than marked restriction, in activities of daily living.  In support of this finding, the ALJ stated, "[i]n session with the consultative psychological examiner, the claimant reported engaging child rearing and raising activity, some household chores, conceded the ability to manage her own finances to access public transportation and to live independently."  (Tr. 79)

He also found that plaintiff had moderate difficulties with social functioning.  In support, the ALJ pointed to the fact that plaintiff "endorsed difficulty being around others, yet in session with the consultative psychological examiner, the claimant reported no problems relating to the

general public, admitted of no forensic history, and was quite pleasant and polite." (Tr. 80)

The ALJ found that, with regard to concentration, persistence or pace, plaintiff had moderate difficulties, stating, "[i]n session with the consultative psychological examiner, the claimant was alert and oriented in all spheres, displayed below average fund of knowledge, vocabulary, and computational skills, performing, overall, in the borderline range of intellectual function." (Tr. 80)

Finally, related to the fourth category of "paragraph B" criteria, the ALJ found that the claimant had not experienced any episodes of decompensation which have been of extended duration.  He reasoned, "[t]he claimant was an inpatient in a psychiatric hospital for a period of five days in 2011.  However, because this stay did not meet the durational requirements of the regulations, she has experienced no episodes of decompensation of extended duration."

The ALJ concluded that, "[b]ecause the claimant's mental impairments do not cause at least two "marked" limitations or one "marked limitation" and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied."

Plaintiff argues that the ALJ relied on interview observations from the single examination of Dr. Ickes to find that plaintiff was only moderately limited in activities of daily living, social functioning, and concentration, persistence and pace.  Plaintiff points out, however, that Dr. Ickes actually opined that plaintiff was "markedly impaired" in her ability to relate with others, "markedly impaired" in her ability to maintain attention, concentration, persistence, and pace, and "extremely impaired" in her ability to withstand the stress and pressure associated with day-to-day work activities.  Plaintiff argues that the her treating psychiatrist's notes support Dr. Ickes' findings and opinions and argues that the ALJ erred in assigning little weight to the opinion of Dr. Ickes and in failing to find that her mental impairments met or medically equaled

in severity the Listings of 12.04, 12.06 and 12.07.

While plaintiff has accurately pointed out that the ALJ supported his findings with Dr. Ickes' observations, later in the ALJ's decision, he explains why he assigned little weight to Dr. Ickes's opinion.  The ALJ explains, "Dr. Ickes examined the claimant on a single occasion and was reporting within the bounds of his professional certifications and specialty; however, his opinion was not consistent with his own observations, which included indications that the claimant was pleasant and polite, demonstrated adequate persistence and pace, and engaged in no overt signs of anxiety.  Moreover, his opinion was not consistent with the claimant's reports, among which was her observation that she always related well to the public."  (Tr. 86)

The court's task in reviewing a Social Security disability determination is a limited one.  The ALJ's findings are conclusive if they are supported by substantial evidence, according to 42 U.S.C. § 405(g).  *Stead v. Commissioner of Social Security,* 352 F.Supp.2d 807, 2005 U.S. Dist. LEXIS 972 (E.D. Mich. 2005).  Consequently, the court's review is confined to determining whether the findings are supported by substantial evidence, considering the record as a whole.  *Id.*, citing *Wright v. Massanari,* 321 F.3d 611, 614 (6th Cir. 2003).

Here, the ALJ considered listings 12.04, 12.06 and 12.07 and determined that plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of listed impairments.  The ALJ's decision was supported by substantial evidence in the record, which he explained in his decision.  This court's role is not to "resolve conflicting evidence in the record or to examine the credibility of the claimant's testimony."  *Wright*, 321 F.3d at 614.  Nor may the court try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984)  Where the commissioner's decision is supported by substantial evidence, it must be upheld even if the

record might support a contrary conclusion. *Smith v. Sec. of Health & Human Servs.,* 893 F.2d 106, 108 (6th Cir. 1989)  Because the ALJ's decision that plaintiff's impairments did not meet or medically equal the severity of one of the listed impairments was supported by substantial evidence in the record, the court recommends that the ALJ's decision be affirmed.

Plaintiff also argues that the ALJ did not provide any specific analysis as to plaintiff's pseudo-seizure disorder and how the physical manifestation of that impairment would interfere with plaintiff's abilities to maintain activities of daily living, social functioning, or concentration, persistence or pace.  Plaintiff points to certain portions of the ALJ's decision where he compares this condition to the findings of medical testing and argues that the ALJ improperly evaluated this condition as a physical impairment.  Plaintiff seems to be arguing that, because plaintiff's pseudo-seizures had a psychological etiology, no medical evidence would be expected to support it.  Consequently, plaintiff contends that the ALJ's analysis of her mental impairment was flawed.

The court has considered plaintiff's argument related to the ALJ's evaluation of her pseudo-seizure condition.  Although the ALJ does refer to the medical evidence in relation to this condition, he also points to portions of the records from mental status examinations that suggest that plaintiff would only have moderate difficulties with social and occupational function. For example, the ALJ states, "the claimant reported more than one daily seizure, but the record is not supportive of that frequency, with very few witnessed seizures."  (Tr. 83)  The ALJ also points to plaintiff's own representations regarding her daily activities in support of his decision that she can perform a range of light unskilled work.  The decision includes the following analysis:

> * * * the claimant has reported the following daily activities:  the ability to attend to her personal hygiene and grooming, to engage in child raising activities, to engage in household chores, including gardening and meal preparation, to manage

31

her own medications, to shop in stores, manage her own finances, to use a computer, to access public transportation, to reach and watch television for pleasure. In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled": when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

The ALJ also states,

The record includes statements by doctors suggesting the claimant was engaging in possible exaggeration or misrepresentation. During the course of a 24-hour Holter monitor examination, the claimant reported multiple episodes of various symptoms, while the monitor continued to record normal findings. During psychological examination, the claimant returned results on the Millon Clinical Multi-axial Inventory-Third Edition, suggestive of a tendency to magnify symptoms, to complain and to engage in self-pity. An emergency room physician indicated that the claimant had multiple complaints, but that her reason for visiting the emergency room was to secure pain medications. Another emergency room physician reported that the claimant's reported pain was out of proportion to tactile stimuli. * * *

After carefully considering plaintiff's arguments, the ALJ's decision and applicable law, the court cannot say that the ALJ's analysis of plaintiff's diagnosis of pseudo-seizures was improper or legally flawed. While the ALJ did compare the limitations that this diagnosis may have caused to the medical evidence, he also compared it to plaintiff's own statements and the mental evaluations in the record. As the fact-finders, the Secretary and her examiners weigh and evaluate the credibility of the witnesses. *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 536 (2001). Evidence of plaintiff's daily activities, considered in combination with objective results of exams and the opinions of various physicians evaluating plaintiff's physical and mental condition provided substantial evidence to support the ALJ's conclusion that plaintiff was not disabled due to her pseudo-seizure condition. The ALJ's finding that plaintiff had the residual functional capacity to perform a range of light unskilled work was supported by substantial

evidence in the record.

## VII.    Conclusion

In summary, the court should find that the ALJ properly considered and weighed the evidence. The ALJ's decision that Ms. Cyrus's impairment or combination of impairments did not meet or medically equal the severity of one of the listed impairments and that she had the residual functional capacity to perform a range of light, unskilled work was supported by substantial evidence.  Ms. Cyrus has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  For these reasons, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: May 31, 2016                                     s/Thomas M. Parker
                                                        United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**