UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Jennifer Marie Cyrus, | ) | CASE NO. 5:15 CV 896 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon the Report and Recommendation of Magistrate Judge Thomas M. Parker ("R&R")(Doc. 14) recommending that the decision of the Commissioner be affirmed. Plaintiff has filed an objection to the R&R. For the reasons that follow, the objection is well-taken. The R&R is REJECTED and this matter is REMANDED to defendant for further proceedings.

**FACTS**

The parties do not dispute the medical evidence of record. Accordingly, for the sake of

1

efficiency, the Court will adopt the medical evidence as set forth by the Magistrate Judge:

> On September 2, 2009, [plaintiff] reported to the Wooster Community Hospital emergency department that she had been "blacking out" during her menstrual cycle, but that all tests she had undergone had been normal. (Tr. 620)
>
> On August 18, 2010, plaintiff was admitted to Mercy Medical Center from Dunlap Memorial Hospital for a possible seizure. (Tr. 411-419) An EEG recording was normal, as was a brain MRI. (Tr. 411, 418) [Plaintiff] was discharged to home on August 20, 2010. (Tr. 412) Her final diagnosis included "conversion reaction consisting of altered level of consciousness as well as seizure-like activity." (Tr. 412) [Plaintiff] was instructed to follow up with her primary care physician in one to two weeks and to follow up with a mental health care facility. (Tr. 412)
>
> Plaintiff presented to the Counseling Center of Wayne & Holmes County on August 26, 2010. (Tr. 565) Ms. Cyrus reported that she was unable to work but was hopeful of returning to her job. (Tr. 566) She was diagnosed with major depressive disorder and assigned a Global Assessment of Functioning (GAF) score of 55. (Tr. 572)
>
> A cervical MRI on September 23, 2010 found no significant central canal or neural foraminal stenosis. (Tr. 458)
>
> On September 26, 2010, plaintiff visited the emergency department at Dunlap Memorial Hospital after a motor vehicle accident. (Tr. 434) She reported that she had "a spell" and did not really remember it. (Tr. 434) Ms. Cyrus was diagnosed with cervical strain and seizure disorder. (Tr. 434) Mark Hatcher, M.D. instructed plaintiff that she should not be driving. (Tr. 434)
>
> On October 5, 2010, plaintiff followed up with Dale Angerman, M.D. (Tr. 482) Dr. Angerman's notes indicate that plaintiff had developed left-sided weakness earlier in the summer and injured her neck in the car accident. (Tr. 482) The notes also indicate that she was having problems with depression and anxiety and had been under a lot of stress. (Tr. 482) Plaintiff reported that she was going to physical therapy for her left sided weakness and neck pain. (Tr.482) Dr. Angerman diagnosed neck pain, post trauma; possible syncope; and depression. (Tr. 482) A cervical X-ray showed a bony fragment at C2, possibly related to previous trauma. (Tr. 485) A cervical CT scan on October 14, 2010 was unremarkable. (Tr. 486-487) An EEG on October 18, 2010 was normal. (Tr. 646)
>
> On December 23, 2010, plaintiff saw Mark Weaver, M.A., P.C.C.S., at the Counseling Center. (Tr. 576) He diagnosed major depressive disorder, recurrent, moderate, rule out posttraumatic stress disorder ("PTSD".) (Tr. 576)

On January 6, 2011, plaintiff was treated for pseudo-seizure at the emergency department of Wooster Community Hospital following a seizure. (Tr. 708) Attending physician, Ugo Gallo, M.D., noted the following:

> Reviewing her records, she apparently is not on any anticonvulsants. She has significant psychological issues. She has unusual rhythmic motion of her right hand and head. She did receive Valium prior to arrival. There was no incontinence of urine or stool. There was no biting of her tongue or lip. First test I performed, since she was not verbal, was the arm avoidance test which she held her arm up transiently and fell to her side. Once I told her she was not seizing and this is a false seizure, she stopped abruptly and looked at Maureen, the charge nurse. She then was able to speak with the nurse and give her information with regards to past medical history, etc.

(Tr. 708) Dr. Gallo also reported that her exam was normal and that she appeared depressed. (Tr. 708) Plaintiff was instructed to follow up with Dr. Angerman and her counselor at the Crisis Center. (Tr. 708)

On January 20, 2011, plaintiff followed up with Dr. Angerman. (Tr. 791) Plaintiff reported that she had been more anxious and was having trouble sleeping. (Tr. 792) She told Dr. Angerman that she had been awakened by the emergency room doctor, who felt she was probably having a pseudo-seizure. (Tr. 791) Dr. Angerman's notes also state that plaintiff had what was initially thought to be a stroke last summer, but the hospital had then felt that it was a conversion reaction. (Tr. 791) Plaintiff reported being under a lot of stress because her ex-husband was in prison for abusing one of her children. (Tr. 791)

Also on January 20, 2011, plaintiff saw neurologist, William Novak, M.D. and he recommended evaluation by a physician at the main campus of the Cleveland Clinic. (Tr. 934- 936) He also instructed her to stop taking anti-epileptic medication, advised her not to drive and gave her other seizure precautions. (Tr. 936)

Plaintiff continued to treat with Mr. Weaver at the Counseling Center of Wayne and Holmes Counties. (Tr. 577-579) On February 7 and 16, Mr. Weaver observed moderate depression and moderate anxiety. (Tr. 578, 579) On February 25, 2011, Mr. Weaver noted normal mental status evaluation but for mild depression. (Tr. 577)

On March 16, 2011, plaintiff's neurologist, Dr. Novak, noted that plaintiff's seizures were non-epileptic and instructed her to follow up with psychiatry for PTSD. (Tr. 932)

On March 23, 2011, plaintiff reported to Mr. Weaver that, during a recent hospitalization, the Cleveland Clinic had referred her to psychiatry, had told her that she was having stress induced seizures, and had diagnosed her with depression, anxiety and PTSD. (Tr. 863)

On March 29, 2011, plaintiff followed up with Dr. Angerman for seizures and depressive disorder. (Tr. 779) Plaintiff reported still having seizure like activity at least once a day, sometimes in her sleep. (Tr. 779) Dr. Angerman's notes state that he wrote her a letter stating that she would be unable to work for [at] least six months and also requesting a home health aide twice a week for bathing. (Tr. 780)

On April 27, 2011, plaintiff saw Dr. Novak's nurse practitioner for a recent seizure episode. (Tr. 931) Plaintiff was instructed to see a psychiatrist "STAT." (Tr. 931)

On April 28, 2011, plaintiff had a pseudo-seizure during counseling at the Counseling Center of Wayne and Holmes County. (Tr. 855) Plaintiff's fiancé reported that, during such episodes, when recalling her history of childhood sexual abuse, she would hit herself or pull her hair or lash out verbally as though in a flashback to the abuse. (Tr. 855) Mr. Weaver called an ambulance and plaintiff was transported to the emergency department at Wooster Community Hospital. (Tr. 855-857) Plaintiff was noted to have a longstanding history of depression, anxiety, PTSD and pseudo-seizures. (Tr. 650) She was diagnosed with pseudo-seizures, depression and anxiety, and mental health decompensation. (Tr. 650) Attending physician, Stacy Shundry, M.D., contacted Mr. Weaver who felt that plaintiff was decompensating and required psychiatric admission. (Tr. 650) Dr. Shundry "pink-slipped" plaintiff for psychiatric admission to Barberton Summa Hospital, where plaintiff stayed until May 2, 2011. (Tr. 650, 843, 856, 857).

Plaintiff did not show up for her next appointment with Dr. Weaver on May 6, 2011. (Tr. 849) Mr. Weaver called her and plaintiff stated that she did not want to continue counseling with Mr. Weaver. (Tr. 849) She was angry that he had sent her to the hospital and she had been pinkslipped to Barberton Summa Hospital. (Tr. 849) She told Mr. Weaver that she was scheduled to see another counselor at a different agency on May 9th. (Tr. 849)

On May 9, 2011, plaintiff met with a different counselor at Your Human Resource Center and reported she did not want to return to Mr. Weaver again because he had involuntarily admitted her to Barberton Summa Hospital. (Tr. 804) Plaintiff was diagnosed with "posttraumatic stress disorder and depressed mood; rule out bipolar disorder mixed with psychotic features; avoidant and depressive personality disorder with passive aggressive traits and paranoid features." (Tr. 810)

On May 12, 2011, plaintiff met with Vera Astreika, M.D., for a follow up appointment after being discharged from Barberton Summa Hospital. (Tr. 843-845) Plaintiff reported a lower level of anxiety with medication compliance but complained of falling asleep during the day. (Tr. 843) Ms. Cyrus also reported that she was continuing to have panic attacks triggered by stress as well as having flashbacks and nightmares. (Tr. 843) Plaintiff avoided public places and felt on guard when in public. (Tr. 843) Plaintiff described to

4

Dr. Astreika that she had been gang-raped three times and molested by her biological father when she was three years old, and that her husband was in prison for having molested her older son. (Tr. 844) Dr. Astreika noted that plaintiff fell asleep during the interview, had an anxious mood, had possible borderline intelligence, had fair insight and judgment and presented with PTSD symptoms. (Tr. 844-845) Dr. Astreika diagnosed PTSD, depressive disorder, cluster B personality disorder traits, possible borderline intellectual functioning, and she assigned a GAF scale score of 50. (Tr. 845)

On May 20, 2011, plaintiff saw Dr. Novak's nurse practitioner. (Tr. 930) Plaintiff reported that she had seen a psychiatrist and that she had had fewer non-epileptic seizures since starting Abilify. (Tr. 930)

Plaintiff saw Dr. Astreika on June 10, 2011. (Tr. 836) Dr. Astreika noted that plaintiff had stopped taking Abilify because of nausea and vomiting and returned to Risperdal. (Tr. 836) Plaintiff also reported that she was having daytime sleepiness and was not able to work. (Tr. 836) Plaintiff requested a work excuse for the Department of Job & Family Services. (Tr. 836) Plaintiff complained of having episodes of rage when thinking about her past abuse. (Tr. 836) Dr. Astreika noted normal mental status but for fair insight and judgment, "angry" mood, and symptoms of PTSD. (Tr. 836) Dr. Astreika assigned a GAF scale score of 50. (Tr. 836)

Plaintiff met with Dr. Astreika again on June 24, 2011. (Tr. 833) Plaintiff reported feeling better but that she was still angry. (Tr. 833) Plaintiff was not sure that counseling would help. (Tr. 833) Dr. Astreika completed a mental capacity assessment for the Department of Job & Family Services. (Tr. 833) Plaintiff presented with normal mental status but for fair insight and judgment and symptoms of PTSD and anger. She was assigned a GAF scale score of 50. (Tr. 833)

Plaintiff saw Dr. Astreika again on July 8, 2011 and reported feeling less angry than when last seen. (Tr. 830) Dr. Astreika noted normal mental status, with fair insight and judgment, and symptoms of PTSD and anger, "somewhat improved," with a GAF scale score of 50.[1] (Tr. 830)

On July 12, 2011, plaintiff returned to the Wooster Community Hospital emergency department with her husband, who reported that she had four seizures lasting approximately ten minutes that day. (Tr. 657) Her husband also reported that plaintiff had up to 10 seizures per day depending on her "stress and anxiety" level. (Tr. 657) Plaintiff did not have any seizure activity while at the emergency department and was discharged

---

[1]  It appears that the Magistrate Judge erroneously transcribed this number as the R&R indicates that the GAF score was 30 when in fact Dr. Astreika assigned a GAF score of 50.

5

with a diagnosis of recurrent pseudo-seizures. (Tr. 657-58)

Plaintiff followed-up with Dr. Angerman on July 13, 2011. (Tr. 750-752) Plaintiff requested a letter stating that she could not attend the work hardening program for Medicaid. (Tr. 751) She complained that her medications made her lethargic and that she was sleeping all day long. (Tr. 750-751) Dr. Angerman diagnosed seizure disorder, lethargy, dehydration and anxiety. (Tr. 752) He gave her a letter stating that plaintiff could probably not work for the next three months. (Tr. 752)

On July 14, 2011, plaintiff went to the emergency department again following another seizure. (Tr. 697) Plaintiff reported that she had a typical seizure and would not have sought medical treatment but a bystander had called 911. (Tr. 697) She reported having up to ten seizures per day, typically occurring with stress. (Tr. 697) Attending physician, Christopher Dussell, M.D., diagnosed chronic seizure disorder and discharged plaintiff. (Tr. 697)

On July 15, 2011, plaintiff saw Dr. Astreika and reported increased confusion and increased frequency of pseudo-seizures. (Tr. 827) Dr. Astreika noted that plaintiff appeared sedated, with her eyes closed, had a "stressed" mood and fair insight and judgment. (Tr. 827) Dr. Astreika diagnosed PTSD, depressive disorder, cluster B personality traits, possible borderline intellectual functioning and assigned a GAF scale score of 40. (Tr. 827)

On August 7, 2011, Mr. Weaver noted that plaintiff was not seeing anyone for counseling, although she was supposed to have been assigned to a counselor at Your Human Resource Center. (Tr. 823) Mr. Weaver questioned whether plaintiff should be seeing him again or be reassigned to another counselor at his facility. (Tr. 823-4)

Plaintiff saw Dr. Astreika on August 10, 2011 and reported feeling somewhat better though still presented as being confused/sedated. (Tr. 822) She told Dr. Astreika that she liked Risperdal because it helped her "not to have crazy thoughts." (Tr. 822) Dr. Astreika noted plaintiff's GAF scale score as 50. (Tr. 822)

On September 26, 2011[2], plaintiff saw Dr. Astreika again and noted that she had improved since taking Risperdal, but had been having increased anxiety and nightmares since the death of a friend. (Tr. 818) Dr. Astreika noted that plaintiff's mood was stressed and her insight and judgment was fair. (Tr. 818) Dr. Astreika diagnosed PTSD, depressive disorder, cluster B personality disorder traits, possible borderline intellectual functioning, and a GAF scale score range of 50-60. (Tr. 818)

---

[2]   The Magistrate Judge erroneously transcribed this date as "August 26, 2011."

6

On October 14, 2011, plaintiff saw Dr. Angerman for follow-up complaining of several migraines per week and what were "probably pseudoseizures." (Tr. 735) Dr. Angerman's diagnosis was migraines, hypokalemia, sciatica, back pain and epilepsy. (Tr. 737)

On October 24, 2011, Dr. Astreika's notes indicate that plaintiff had been feeling better since she was last seen. (Tr. 817) She was complying with her medications. (Tr. 817) Her mental status was normal and her diagnosis was unchanged, as was her GAF scale score. (Tr. 817)

Plaintiff saw Dr. Novak on November 2, 2011. Dr. Novak noted that plaintiff's pseudoseizures/ non-epileptic seizures persisted and that "surprisingly" her only psychiatric medication was Celexa. (Tr. 928)

On December 13, 2011, plaintiff saw Dr. Astreika who noted that plaintiff had been feeling good and was compliant with her medication regimen. (Tr. 816) She observed normal mental status and diagnosed PTSD, depressive disorder, cluster B personality disorder traits, possible borderline intellectual functioning and assigned a GAF scale score range of 50-60. (Tr. 816)

Plaintiff visited Dr. Astreika on April 4, 2012 and reported that she had been in and out of the hospital since February 2012. (Tr. 1016) She reported that she had been [compliant] with her medication and denied having any side effects. (Tr. 1016) Plaintiff also reported being very stressed. (Tr. 1016) Dr. Astreika noted that plaintiff's insight and judgment were fair and that she had a normal mental status. (Tr. 1016) Dr. Astreika did not modify her previous diagnosis or GAF scale score range of 50-60. (Tr. 1016)

Plaintiff visited the emergency department at Wooster Community Hospital on May 1, 2012. (Tr. 967) The emergency department history notes state that "a 34 year-old woman who presents from work because of pseudoseizure and head contusion." (Tr. 967) Plaintiff had a contusion over her left brow, had pain out of proportion to tactile stimuli. (Tr. 967) She was discharged with a diagnosis of contusion of head status post fall secondary pseudoseizure with a history of pseudotumor cerebri. (Tr. 967)

On May 7, 2012, Sarel Vorester, M.D. sent a letter informing Dr. Novak that Dr. Vorster had evaluated plaintiff for headaches and recent visual disturbances but that all studies had been negative. (Tr. 939) Dr. Vorster was unable to confirm a diagnosis of pseudotumor cerebri and was unable to identify any other intracranial pathology that would explain her symptoms. (Tr. 939)

Plaintiff returned to Dr. Astreika on May 24, 2012 and reported increased anxiety and depression because her fiancé has some suspicious findings on lung X-rays. (Tr. 1015) Plaintiff was having crying spells and insomnia due to anxiety and was in therapy at

human resources. (Tr. 1015) Dr. Astreika observed normal mental status but for anxious mood, fair insight and judgment and worsening anxiety symptoms due to stress. (Tr. 1015) Plaintiff's diagnosis remained the same and her GAF scale score was stated as 50. (Tr. 1015)

Plaintiff had another seizure on May 29, 2012 and was taken by ambulance to Wooster Community Hospital. (Tr. 965) The EMS notes stated that her entire body had been shaking, and according to a bystander, had been shaking for eight minutes prior to EMS arrival. (Tr. 965) Plaintiff had fallen and hit her head. (Tr. 965) A CT scan of plaintiff's brain showed air fluid in her sinus but was otherwise unremarkable. (Tr. 965) Plaintiff and her family informed the emergency department staff that she was going to start seeing Dr. Bavis instead of Dr. Novak. (Tr. 966) Plaintiff was discharged with a diagnosis of head injury status post pseudo-seizure. (Tr. 966)

Plaintiff saw Dr. James Bavis, Jr., M.D., on May 30, 2012 and reported her history of pseudo-seizures. (Tr. 1118-1119) Dr. Bavis observed an odd gait and movements which he felt were psychogenic and pain related. (Tr. 1119) After reviewing plaintiff's medical history, Dr. Bavis assessed that she had non-epileptic pseudoseizures and told her that this condition needed to be treated by a psychiatrist. (Tr. 1119)

Plaintiff returned to the Wooster community Hospital emergency department on May 32, 2012 and reported having a seizure. (Tr. 962) The reason she went to the emergency department was for pain in her neck. (Tr. 962) She returned there again on June 6, 2012 following a seizure.(Tr. 960) She was discharged with a diagnosis of migraine headache and pseudoseizure. (Tr. 960)

Plaintiff saw Dr. Bavis on June 8, 2012 and complained of severe headache, neck pain and frequent seizures. (Tr. 1113-1116) Dr. Bavis increased plaintiff's Topamax and Neurontin but would not prescribe narcotics for headache control. (Tr. 1115)

Plaintiff saw Dr. Astreika on June 21, 2012 and complained of feeling depressed, tired, having leg pain, insomnia, poor concentration, daily anxiety attacks, and nightmares. (Tr. 1014) Plaintiff had restarted Topamax and was compliant with her Risperidone and Celexa but was not taking her Lorazepam or Vistaril because they were not helping her anxiety and they were making her tired and sleepy. (Tr. 1014) Plaintiff reported that she had lost sensation in both legs and had fallen several times. (Tr. 1014) Dr. Astreika's notes indicate that plaintiff had a crippled appearance and was walking with a cane. (Tr. 1014) Dr. Astreika noted normal mental status but for depressed mood, constricted affect, fair insight and judgment, and worsened symptoms. (Tr. 1014) She diagnosed PTSD, major depressive disorder, recurrent and moderate, cluster B personality disorder traits, and possible borderline intellectual functioning, and she assigned a GAF scale score range of 40 to 50. (Tr. 1014) She discontinued plaintiff's Celexa, Lorazepam and Vistaril, continued Risperidone and added Cymbalta. (Tr. 1014)

A lower extremity electromyography nerve conduction velocity study on July 2, 2012 was normal. (Tr. 1112)

On August 2, 2012, plaintiff saw Dr. Bavis and reported migraine headaches and occipital neuralgia. (Tr. 1093) Dr. Bavis noted Plaintiff's odd gait disorder had resolved, "which again furthers the feeling that I had that she was having a psychogenic gait disorder issue." (Tr. 1093)

On August 13, 2012, plaintiff told Dr. Astreika she had been very anxious and had more seizures since having a miscarriage one month prior. (Tr. 1013) Plaintiff stated that she was also stressed because her irresponsible brother and his fiancé were living with her. (Tr. 1013) Plaintiff had not tolerated Cymbalta due to chest pain but was taking Celexa and Risperidone. (Tr. 1013) Plaintiff also requested Ativan. (Tr. 1013) Dr. Astreika observed anxious mood and congruent affect, with fair insight and judgment and she assigned a GAF scale score of 50-60. (Tr. 1013)

On September 3, 2012, plaintiff was taken by ambulance to the Wooster Community Hospital emergency department after her fiancé believed she had stopped breathing while having one of her pseudoseizures. (Tr. 1085) He reported that he had given her mouth to mouth resuscitation. (Tr. 1085) However, when the EMS arrived, plaintiff's oxygen saturation level was 100. (Tr. 1085) She was awakened by EMS. (Tr. 1085) A chest X-ray was normal. (Tr. 1085) Plaintiff recovered and was discharged with the diagnosis of pseudoseizure. (Tr. 1085)

On September 13, 2012, plaintiff met with Dr. Astreika who noted that plaintiff had been medication compliant and was feeling good. (Tr. 1066) She had an allergic reaction to Oxbutynin that caused apnea and was scheduled for a hysterectomy in October. (Tr. 1066) Dr. Astreika noted that plaintiff had a normal mental status, with a mood close to euthymic and fair insight and judgment. (Tr. 1066) Dr. Astreika's diagnoses remained the same. (Tr. 1066) She assigned a GAF scale score of 60.

Plaintiff returned to the emergency department on March 4, 2013. (Tr. 1156-57) Plaintiff complained of bilateral leg edema and shortness of breath. (Tr. 1156) Tests returned normal results. (Tr. 1157) She was discharged with the diagnoses of bilateral leg edema, dyspnea, chest pain, atypical and paresthesias of uncertain cause. (Tr. 1157)

It does not appear that any of plaintiff's treating mental health providers provided opinion evidence in connection with plaintiff's application for benefits.  Defendant thereafter requested an examination by consultive psychologist Dr. Ickes.  Dr. Ickes opined that plaintiff is markedly

limited in relating to others and in maintaining concentration, persistence, and pace.  Dr. Ickes also opined that plaintiff is extremely impaired in her ability to withstand the stress and pressures associated with day-to-day work activities.  He assigned a GAF score of 45.  A GAF score in this range is indicative of serious symptoms.

The ALJ determined that plaintiff is not disabled.  In so doing, the ALJ assigned little weight to the opinion of Dr. Ickes.  The ALJ noted:

> [Dr. Ickes's opinion] was not consistent with his own observations, which included indications that the claimant was pleasant and polite, demonstrated adequate persistence and pace, and engaged in no overt signs of anxiety (6F).  Moreover, his opinion was not consistent with the claimant's reports, among which was her observation that she always related well to the public (6F/3).

In addition, the ALJ analyzed plaintiff's pseudo-seizure disorder based on medical criteria, even though the disorder is not caused by physical symptoms.

The Magistrate Judge recommends accepting the ALJ's decision.  Plaintiff objected to the R&R and the government filed a response.

**ANALYSIS**

Federal Rule of Civil Procedure 72, which governs the matter herein inasmuch as timely objections have been made to the Report and Recommendation, provides in part:

> **(b) Dispositive Motions and Prisoner Petitions.**
> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

As stated in the Advisory Committee Notes, "The term 'de novo' signifies the magistrate's findings are not protected by the clearly erroneous doctrine, but does not indicate

that a second evidentiary hearing is required." *citing United States v. Raddatz*, 447 U.S. 667 (1980).

As an initial matter, the Court rejects the government's argument that the plaintiff did not preserve her objections. Upon review, the Court finds that the plaintiff indicates that she objects to the R&R based on the ALJ's failure to properly weigh Dr. Ickes's opinion. In addition, plaintiff objects that the ALJ addressed plaintiff's mental disorder of pseudo-seizures based on medical criteria and failed to account for the affects of the disorder on plaintiff's ability to work.

Before the Magistrate Judge, plaintiff argued that the ALJ erred in assigning little weight to Dr. Ickes's opinion:

> The examiner further opined that Plaintiff's overall functioning fell on the GAF scale at 45, indicating serious impairment in functioning. (Tr. 628.) On balance, Plaintiff's treating psychiatric notes support Dr. Ickes' findings and opinions, reflecting symptoms and functioning which ranged over time from moderate (GAF scale scores of up to 60), to severe (GAF scale scores of 50), to even worse (scores ranging from 40 to 50), and considered only Plaintiff's PTSD and depression diagnoses, not any pseudo-seizure effects. Plaintiff's abilities to perform the tasks she cited to the consultative examiner do not amount to substantial evidence to support only moderate limitations, because they are disrupted so frequently by her mental-health symptoms, including her pseudo-seizures.

The Magistrate Judge rejected this argument and concluded as follows:

> While plaintiff has accurately pointed out that the ALJ supported his findings with Dr. Ickes' observations, later in the ALJ's decision, he explains why he assigned little weight to Dr. Ickes's opinion. The ALJ explains, "Dr. Ickes examined the claimant on a single occasion and was reporting within the bounds of his professional certifications and specialty; however, his opinion was not consistent with his own observations, which included indications that the claimant was pleasant and polite, demonstrated adequate persistence and pace, and engaged in no overt signs of anxiety. Moreover, his opinion was not consistent with the claimant's reports, among which was her observation that she always related well to the public." (Tr. 86)

Although the Court finds this to be a close call, upon review, the Court agrees with plaintiff. The Court is aware that Dr. Ickes is not a treating source, nevertheless the Court

11

concludes that the ALJ failed to properly weigh this opinion.  Dr. Ickes assigned a GAF sore of 45, which is indicative of serious symptoms.  This score is consistent with the work related limitations Dr. Ickes noted after his examination.  Although not set forth in the paragraph addressing Dr. Ickes's opinion, the ALJ relied on the GAF scores provided by plaintiff's treating sources in assessing plaintiff's claim.  The ALJ noted as follows:

> The claimant has received multiple global assessment of function scores, from a low of forty (12F/7), indicative of major impairment of social or occupational function, to a high in the range of fifty to sixty (19F/2), indicative of no more than moderate difficulties of social or occupational function. *Most typically and consistently*, however, her scores have been in the range of fifty to sixty (4F/10), (llF/9), (12F/6, 7, 8), (21F/2), indicative, again, of no more than moderate difficulties of social or occupational function.

(Tr. 84)(emphasis added).

The statement, however, is a mischaracterization of the record.  As plaintiff points out, plaintiff more often than not presented with GAF scores of 50 or less.  (Tr. 845, 836, 833, 830, 827, 822, 1015, 1014).  Thus, it appears on at least eight occasions, plaintiff's treating physicians assessed plaintiff's GAF score to be at 50 or less, indicative of serious symptoms.  On fewer occasions, plaintiff presented with scores of 51-60.  (Tr.572, 818, 817, 816, 1016, 1013, 1066).  Thus, because more often than not, plaintiff presented with a GAF scores of 50 or below, the ALJ's characterization of the record as disclosing GAF scores that are "typically and consistently" indicative of only moderate difficulties is simply not accurate.

Again, although this presents a close question, the Court finds that the ALJ did not give sufficient reasons for assigning "little weight" to Dr. Ickes's opinion based on purported "inconsistencies."  By way of example, the ALJ assigned little weight to the opinion of Dr. Ickes because plaintiff presented to the appointment as "pleasant and polite" and displayed no "overt

12

signs of anxiety." While this may be true during plaintiff's appointment with Dr. Ickes, this fact is not inconsistent with his conclusions regarding her work related abilities as a whole. There is no indication that plaintiff's work-related limitations would cause her to *never* exhibit "pleasant and polite" behavior or to continuously display overt signs of anxiety. Thus, the fact that she may have been pleasant and polite without displaying overt signs of anxiety during her appointment is not inconsistent with Dr. Ickes's assessment. This is especially so given plaintiff's extensive treatment history for very serious psychological impairments.

The ALJ also assigned little weight to the opinion of Dr. Ickes because Dr. Ickes noted that plaintiff displayed "adequate" persistence and pace. This description, however, relates to plaintiff's ability to perform on a short-term pscyhometric test. Again, her ability to put forth "adequate" persistence and pace with regard to this type of activity is in no way inconsistent with a determination that she is markedly limited in her ability to maintain "attention, concentration, persistence, and pace to perform simple repetitive tasks" in the context of *full-time employment*.[3]

Having concluded that the ALJ erred in assessing Dr. Ickes's opinion, the Court finds plaintiff's objection in this regard to be well-taken. Because remand is appropriate in any event, the Court need not reach plaintiff's alternative argument, *i.e.*, that the ALJ erred in assessing plaintiff's pseudo-seizure disorder.

**CONCLUSION**

---

[3] The only other reason the ALJ gave for the weight assigned to Dr. Ickes's opinion is plaintiff's self-reporting that she is able to relate to the public. In reality, the statement from Dr. Ickes indicated that plaintiff "denied any history of legal charges or arrests and "was said to have no problems relating to the general public." It appears that she may answered this question as it pertains to her involvement with criminal activity and the public.

For the foregoing reasons, the objection is well-taken. The R&R is REJECTED and this matter is REMANDED to defendant for further proceedings.

IT IS SO ORDERED.


  /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 8/31/16